# United States Court of Appeals
## For the First Circuit

No. 06-1643

UNITED STATES OF AMERICA,

Appellee,

v.

ANTHONY GOBBI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya and Lynch, Circuit Judges.

Judith H. Mizner, Assistant Federal Defender, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Robert Clark Corrente, United States Attorney, James H. Leavey
and Adi Goldstein, Assistant United States Attorneys, were on
brief, for appellee.

December 28, 2006

**SELYA**, **Circuit Judge**.  In a split decision, a jury acquitted defendant-appellant Anthony Gobbi on three counts of a five-count indictment but convicted him of conspiracy and one substantive drug-trafficking charge.  On appeal, Gobbi mounts a three-pronged attack, challenging (i) the sufficiency of the evidence underpinning one of the two counts of conviction; (ii) an evidentiary ruling; and (iii) two sentencing enhancements.  Concluding, as we do, that Gobbi's arguments are devoid of merit, we affirm the judgment below.

## I.  BACKGROUND

This case grows out of a reverse sting operation conceived by the Federal Bureau of Investigation (FBI).  We rehearse the relevant facts in the light most hospitable to the jury's verdict on the counts of conviction, consistent with record support.  See United States v. Maldonado-García, 446 F.3d 227, 229 (1st Cir. 2006).

On June 29, 2000, an FBI agent, Michael McGowan, posing as a wealthy businessman, met with Robert Nardolillo (a suspected underworld figure). McGowan said that his business partner ("Manny") wanted to enter the New England drug trade and could supply Nardolillo with copious amounts of drugs.  Nardolillo expressed interest and acknowledged that he could handle two to three kilograms of cocaine per week, and possibly more.  The men

agreed to meet again so that McGowan could introduce his apocryphal partner to Nardolillo.

That fall, Nardolillo and Gobbi traveled to Ft. Lauderdale, Florida. They met McGowan there on September 28. After McGowan explained that "Manny" was unavoidably detained, Gobbi left. McGowan and Nardolillo nonetheless proceeded to discuss the planned venture.

Thereafter, McGowan and Nardolillo spoke regularly by telephone about the prospects of doing business together. Nardolillo instructed McGowan to contact him through his associates (including Gobbi), and Gobbi in fact acted as an intermediary for sixteen of the seventeen contacts between McGowan and Nardolillo in January of 2001.

On January 15, 2001, Nardolillo and Gobbi finally came face to face with "Manny" (in reality, another undercover FBI agent). This meeting took place at Centerfolds, a Providence strip club. Following the initial introduction, Nardolillo spoke privately with "Manny" for about an hour.

On January 22, McGowan approached Nardolillo about a possible drug-protection detail. The idea was that Nardolillo and his crew would guard a cache of cocaine temporarily located in Rhode Island en route to distribution throughout New England. Nardolillo readily agreed. McGowan and Nardolillo settled on remuneration at the rate of $500 per kilogram for the protective

detail. On March 15, Nardolillo assured McGowan that "I'll put my guys there, don't worry. There'll be somebody there to watch [Manny's] stuff all the time." Switching to a different topic, McGowan informed Nardolillo that "Manny" did not yet have five kilograms of cocaine that Nardolillo had expressed interest in buying for his own distribution network.

On April 1, McGowan, Nardolillo, and Gobbi met at a funeral. Because law enforcement officers were surveilling the scene, Gobbi escorted McGowan into an office so that he (McGowan) could confer privately with Nardolillo about the particulars of the drug-protection detail. Later that month, Nardolillo told McGowan that he would assign "two guys" to the drug-protection detail; that both would be well-rested; that the man directly guarding the drug cache would be prepared to kill if necessary; and that he (Nardolillo) would divide the agreed payment between the two operatives. McGowan informed Nardolillo that "Manny" wanted a gun displayed for a show of force, but that it was not to be fired.

The drug-protection detail was scheduled for April 30. According to Clifford Falla, Gobbi recruited him for this job. On the assigned date, Gobbi and Falla met with Nardolillo at Centerfolds. Nardolillo told the pair that he had arranged for a drug-protection detail at a local hotel and that Falla was to guard the drugs. In Gobbi's presence, Nardolillo gave Falla a nine-millimeter pistol and directed him to display it while on guard.

-4-

Nardolillo explained that Gobbi would lead Falla to the hotel and wait outside.

During the course of the day, McGowan and Nardolillo met several times. At 2:00 p.m., McGowan told Nardolillo that a fifteen-kilogram shipment of cocaine was en route from Boston; that once the drugs arrived, two men working for "Manny" would measure, subdivide, and package the cocaine in the hotel room; and that another man working for "Manny" would team up with Nardolillo's man to stand guard inside the room. Nardolillo replied: "I trust my two people." He also remarked that he would have preferred to have "both my guys" in the room but that, given the arrangement devised by "Manny," Falla would be the one to stand guard.

Around 6:55 p.m., Nardolillo told McGowan that his two henchmen were on their way to Centerfolds for a last-minute briefing. After Nardolillo received a telephone call (later traced to Gobbi's cell phone), he informed McGowan that his henchmen were outside the club. Nardolillo proceeded to leave the building, presumably to convey his final instructions.

When Nardolillo finished, Falla (driving his own car) followed Gobbi (driving his own car) to a nearby Marriott hotel. In caravan fashion, Gobbi's nephew (Brian King) and another man (Christopher Chapman) followed Falla in a third vehicle. Once in the hotel parking lot, Gobbi gave Falla the keycard to the room and reminded him to display his gun. Falla, King, and Chapman entered

the hotel, while Gobbi took up a position at a gas station across the street.

Once inside the room, Falla displayed his gun and then placed it in plain view on the bed. The undercover agents posing as drug packagers spent the next five hours measuring out seventeen kilograms of what appeared to be cocaine[1] and transporting containers out of the room. When one of the agents asked Falla about the black Cadillac sedan parked outside (a reference to Gobbi's automobile), Falla explained: "I basically work for the guy in the Cadillac and . . . him and I are under [Nardolillo]."

At some point during the evening, Nardolillo learned that Falla wanted to leave his post. Nardolillo instructed Gobbi to deny this request. He then told McGowan that "Tony" — which the jury reasonably could have found was a reference to Gobbi — wanted to discuss exactly what should be done about Falla.

Immediately thereafter, Gobbi repaired to Centerfolds and conferred with Nardolillo and McGowan outside the club. Nardolillo directed Gobbi to input a telephone number into his cell phone; this number, provided by McGowan, linked to one of the undercover agents who was toiling in the hotel room. Then, still using Gobbi's telephone, Nardolillo called the room and spoke with Falla.

---

[1]In point of fact, the substance was not cocaine but a mere imitation. For ease in exposition, however, we nonetheless refer to it as cocaine.

Gobbi thereafter placed four separate calls to the same number over the course of the evening.

The drug-protection detail concluded just after 1:00 a.m. on the morning of May 1. Falla called Gobbi, who instructed him to return to Centerfolds. Nardolillo debriefed Falla and Gobbi, and then forked over $1,500 (to be divided as they saw fit). Falla and Gobbi later hid the gun in a barn owned by Gobbi's girlfriend.

On the same day, McGowan paid Nardolillo $4,500 (somewhat less than the agreed $500 per kilogram). Nardolillo talked freely with McGowan about his arrangements for the prior evening's drug-protection detail. Pertinently, he mentioned that Gobbi's role was to keep an eye on things from outside the hotel, while Falla's role was to stand guard inside the room. Nardolillo described Gobbi as "one of my right-hand" men and recounted how Gobbi had responded when it appeared that Falla might abandon his post. Nardolillo also said that he would pass along the evening's profits to his crew (Gobbi, Falla, King, and Chapman).

A second, somewhat similar drug-protection detail took place on August 22. On this occasion, Gobbi once again recruited Falla; Nardolillo once again gave Falla a handgun in Gobbi's presence. The detail was to take place at the Crowne Plaza hotel in Warwick, Rhode Island. On the assigned date, McGowan handed a keycard for the designated room to Nardolillo, who gave it to Gobbi and instructed him to proceed with Falla to the hotel.

What followed was substantially similar to what had transpired on April 30, except that Gobbi did not remain at the site but, rather, called Falla several times during the course of the detail. When the job was completed, Gobbi picked up Falla and drove to Centerfolds. With Gobbi nearby, McGowan paid $3,300 to Nardolillo. Nardolillo, in turn, paid $750 apiece to Gobbi and Falla, who then stashed the gun in the same barn.

In due season, a federal grand jury returned a five-count indictment charging Nardolillo, Gobbi, and Falla with conspiracy to distribute and possess cocaine with intent to distribute (count 1), two counts of attempted possession of cocaine with intent to distribute (counts 2 and 4), and two counts of possession of a firearm in furtherance of a drug-trafficking crime (counts 3 and 5). See 21 U.S.C. §§ 841(a)(1), 846; 18 U.S.C. §§ 2, 924(c). Both of Gobbi's codefendants eventually entered guilty pleas to multiple counts, but Gobbi stalwartly maintained his innocence.

During the trial, the government called several witnesses, including McGowan and Falla. Gobbi, testifying to his own behoof, admitted that he knew of the April 30 drug-protection detail but denied that he had participated in it. In that connection, he provided a murky explanation for the multiple calls made from his cell phone to Nardolillo and Falla on April 30 and May 1. As to the August 22 detail, he claimed not to have known of that undertaking at all.

After both sides rested, the jury found Gobbi guilty on count 1 (which charged that Gobbi, Nardolillo, and Falla conspired to distribute and possess with intent to distribute in excess of five kilograms of cocaine) and count 2 (which charged that the same threesome, on or about April 30, 2001, "did knowingly and intentionally attempt to possess with intent to distribute in excess of five kilograms" of cocaine).[2] The jury acquitted Gobbi on the remaining three counts.

On April 7, 2006, the district court sentenced Gobbi to a 160-month incarcerative term. This timely appeal followed.

## II. DISCUSSION

On appeal, Gobbi advances three assignments of error. These relate, respectively, to the sufficiency of the government's proof, an evidentiary ruling, and the sentence imposed. We consider each claim in turn.

### A. Sufficiency of the Evidence.

Gobbi — who does not challenge the sufficiency of the evidence underlying his conspiracy conviction (count 1) — maintains that the proof adduced at trial did not permit his conviction on count 2. He argues, in effect, that while there may have been evidence of an overall intent to distribute, there was no evidence

---

[2]The charge was one of attempted possession of cocaine, rather than possession simpliciter, because the agents used sham cocaine instead of real cocaine. See, e.g., United States v. Medina-Garcia, 918 F.2d 4, 7-8 (1st Cir. 1990).

-9-

to establish that any of the three named defendants ever attempted to possess the cocaine. He emphasizes that there was no evidence (a) that he, personally, had an intent to possess cocaine or that he took a substantial step toward that end; (b) that either of his codefendants had such an intent; or (c) that the cocaine was destined for any of the three men.

We review preserved objections to evidentiary sufficiency de novo. See, e.g., United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000). Under that standard of review, we will affirm a conviction as long as the "total evidence, with all reasonable inferences made in the light most favorable to the government, [is] such that a rational trier of fact could have found guilt beyond a reasonable doubt." United States v. Loder, 23 F.3d 586, 590 (1st Cir. 1994). In this undertaking, we consider both direct and circumstantial evidence, upholding the jury's verdict when it is "supported by a plausible rendition of the record." United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).

Here, however, Gobbi made no timely motion for judgment of acquittal below. See Fed. R. Crim. P. 29. In the absence of such a motion, we can provide relief on a sufficiency challenge only if the verdict threatens to work a clear and gross injustice. See Maldonado-García, 446 F.3d at 230; United States v. Hadfield, 918 F.2d 987, 996 (1st Cir. 1990). As we explain below, the evidence in this case suffices to sustain the conviction under the

-10-

ordinary standard of review and, a fortiori, the conviction survives review under the latter standard.

With respect to count 2, the district court instructed the jury, without objection, that it could find Gobbi guilty based on any of three theories: a standard attempt formulation, aiding and abetting, or Pinkerton liability.[3] The jury returned a general verdict on count 2. The law is crystalline that, when the government has advanced several alternate theories of guilt and the trial court has submitted the case to the jury on that basis, an ensuing conviction may stand as long as the evidence suffices to support any one of the submitted theories. See, e.g., Griffin v. United States, 502 U.S. 46, 49-51, 55-60 (1991); United States v. Moran, 393 F.3d 1, 14-15 (1st Cir. 2004). Here, the aiding and abetting theory appears to be the government's strongest, so we start there.

To prove attempt, the government must show that a defendant intended to commit the substantive offense and that he took a substantial step toward its commission. United States v. Doyon, 194 F.3d 207, 210 (1st Cir. 1999). Here, the substantive offense — possession of drugs with intent to distribute — is

---

[3]In Pinkerton v. United States, 328 U.S. 640 (1946), the Supreme Court ruled that a defendant could be found guilty for a substantive criminal act of a coconspirator that was reasonably foreseeable and committed in furtherance of the conspiracy. Id. at 647-48.

-11-

criminalized by 21 U.S.C. § 841(a)(1). For purposes of that statute, possession may be either actual or constructive. See United States v. Bergodere, 40 F.3d 512, 518 (1st Cir. 1994). Actual possession is "the state of immediate, hands-on physical possession." United States v. Zavala Maldonado, 23 F.3d 4, 6 (1st Cir. 1994). Constructive possession occurs when "a person knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others." United States v. Ocampo-Guarin, 968 F.2d 1406, 1409-10 (1st Cir. 1992) (citation and internal quotation marks omitted). Constructive possession of drugs may be "inferred from a defendant's dominion and control over an area where narcotics are found." United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993).

Aided by these abstract principles, we must determine whether a reasonable jury could have found that Gobbi aided and abetted an attempt to possess cocaine on April 30, 2001 (the distribution element is obvious, and so it need not be examined). Since there is no suggestion of actual possession, the question reduces to one of constructive possession. This question demands an affirmative answer: the evidence, taken in the light most favorable to the verdict, supports a conclusion that one of Gobbi's accomplices, Falla, intended constructively to possess the ersatz cocaine handled during the April 30 drug-protection detail; that he

took substantial steps in that direction; and that Gobbi aided and abetted him in that endeavor. We elaborate below.

On this record, the jury reasonably could have found that Falla understood the purpose of a drug-protection detail; that he took a handgun to the hotel room in order to advance that goal; that he displayed the weapon to establish his dominion and control over the cocaine; that no one else in the room made a similar show of force; and that he remained in the room until the job ended. Although Falla did not have exclusive possession of the cocaine, the government did not need to prove that he did; culpable possession, whether actual or constructive, may be either exclusive or joint. Zavala Maldonado, 23 F.3d at 6. Falla could be found to have had joint constructive possession of the cocaine, and to have intended to exclude others, not in the room, from possessing it. No more was exigible.

Of course, there was no cocaine (only a substance that resembled cocaine), so Falla could be found guilty only of attempted possession. See supra note 2. The question, then, is whether the jury reasonably could have found that Gobbi aided and abetted Falla in this attempted possession. We think that it could have done so.

A defendant may be convicted of aiding and abetting when the evidence shows "(1) that the underlying offense was committed by a principal; (2) that the defendant consciously shared the

-13-

principal's knowledge; and (3) that he willfully associated himself in some way with the crime and willfully participated in it as he would in something he wished to bring about." United States v. Keene, 341 F.3d 78, 84 (1st Cir. 2003) (citation and internal quotation marks omitted). Viewing Falla as the principal, the first prong of this three-part paradigm was satisfied. So, too, was the second: the jury reasonably could have found that Gobbi consciously shared Falla's guilty knowledge. After all, there was evidence that Gobbi recruited Falla for the venture and stood by while Nardolillo armed him and described how the job was to be done.

The third part of the paradigm was also satisfied. The record readily supports a finding of Gobbi's culpable participation. To mention only a few items, there was evidence that Gobbi led Falla to the hotel, provided the keycard to the room, kept watch from the street, relayed information to and from Nardolillo during the course of the drug-protection detail, and spoke several times with Falla in an effort to ensure the successful completion of the operation.

The short of it is that the evidence was ample to ground a finding of guilt on an aiding and abetting theory. See, e.g., United States v. Harris, 397 F.3d 404, 415 (6th Cir. 2005). Gobbi, however, endeavors to blunt the force of this reasoning, citing a covey of inapposite cases. See, e.g., United States v.

<u>Yossunthorn</u>, 167 F.3d 1267 (9th Cir. 1999); <u>United States</u> v. <u>Harris</u>, 733 F.2d 994 (2d Cir. 1984). He also seeks to exploit a perceived discrepancy in the government's proof. We briefly discuss that discrepancy.

A video surveillance record introduced into evidence indicated that Falla entered the hotel room at 8:19 p.m. (around twilight on April 30). A law enforcement officer testified, however, that Gobbi left the gas station before dark. Gobbi strives to convince us that this seeming inconsistency is of great moment. We are not persuaded.

Taking a narrow view of this supposed discrepancy, Gobbi's argument is undermined by points he himself raises: the officer's testimony that he first noticed Gobbi's car at the gas station <u>after</u> Falla had entered the hotel, and Falla's testimony that he had a conversation with Gobbi in the hotel parking lot just <u>before</u> entering the hotel. The testimony is not perfectly consistent but, taking a more global view, we are constrained to note that trial testimony often is a notoriously imperfect means of reproducing past events. Exactitude is desirable, but it is not a necessary condition to a finding of credibility. Minor inconsistences are common, unavoidable, and virtually always grist for the factfinder's mill. It was ultimately the province of the jury to assess the significance of any contradictions in the

-15-

evidence — particularly a contradiction as petty as this one. See United States v. Thomas, 467 F.3d 49, 55 (1st Cir. 2006).

We have said enough on this score. Having reviewed the record with care, we conclude that the evidence is sufficient to support Gobbi's conviction on count 2 of the indictment on an aiding and abetting theory. That conclusion, in terms, renders it unnecessary for us to consider either of the government's alternate theories of guilt.

## B.  **Admission of Evidence**.

Gobbi's next claim of error is that the district court improperly admitted evidence of discussions about a possible drug sale from "Manny" to Nardolillo. The main thrust of this claim is that the conspiracy charge (count 1) centered around a drug-protection detail rather than a drug-purchasing scheme and that, therefore, the challenged conversations (which spanned a seven-month period from June of 2000 through January of 2001) were unfairly prejudicial, and unjustifiably injected evidence of other (uncharged) bad acts into the case.

We set the stage. On the first day of trial Gobbi, relying on Evidence Rule 404(b) and arguably on Evidence Rule 403 — for purposes of this appeal, we give Gobbi the benefit of the doubt — objected to evidence of a January 15 conversation relating to the drug-purchasing phase of the investigation. The district

-16-

court overruled the objection. The court later extended its ruling to cover this entire line of testimony.

The two rules upon which Gobbi relies are familiar. The former rule prohibits evidence of other uncharged crimes or bad acts to "prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). The latter rule provides for the exclusion of relevant evidence "if its probative value is substantially outweighed" by, inter alia, a "danger of unfair prejudice." Fed. R. Evid. 403. We examine the force of each rule separately, mindful that an appellate court customarily reviews a trial court's rulings admitting or excluding evidence only for abuse of discretion. See Maldonado-García, 446 F.3d at 231.

1. **Rule 404(b)**. The prohibition against "other acts" evidence typically refers to evidence that is extrinsic to the crime charged and introduced for the purpose of showing propensity. See, e.g., United States v. Epstein, 426 F.3d 431, 438-39 (1st Cir. 2005); United States v. Rodriguez-Estrada, 877 F.2d 153, 155 (1st Cir. 1989). Here, however, we never reach the question of propensity; the drug-purchasing evidence in this case is intrinsic to the conspiracy described in count 1 of the indictment. That is to say, the evidence comprises part and parcel of the charged offense. Thus, the evidence is not "other acts" evidence at all

and, accordingly, Rule 404(b) is not implicated. See United States v. Villarman-Oviedo, 325 F.3d 1, 11 (1st Cir. 2003).

To be sure, Gobbi calls attention to the prosecutor's closing argument (which focused narrowly on the two drug-protection details) and the fact that McGowan did not have a single substantive conversation with Gobbi about possible drug-purchasing activity. On this basis, Gobbi suggests that the conversations about drug purchases do not relate in any way to the conspiracy with which he was charged and of which he was convicted.[4] This is sheer persiflage.

The short answer to Gobbi's plaint is that the charged conspiracy was broader than he acknowledges. While there is no doubt that the lion's share of the government's proof on count 1 centered around the drug-protection phase of the conspiracy, the government also proffered evidence of an integrated drug-purchasing phase. Having knowingly joined the overall conspiracy, Gobbi was criminally responsible for both phases of its illicit endeavors. United States v. Barnes, 244 F.3d 172, 176 (1st Cir. 2001) ("After all, a conspiracy is a continuum. Once a participant knowingly

---

[4]In some ways, Gobbi's argument resembles an argument that a variance existed between the single conspiracy charged in the indictment and what he views as multiple conspiracies presented at trial. No such issue was appropriately raised below (say, by seeking a jury instruction on single versus multiple conspiracies), nor has such an issue been briefed in those terms on appeal. Consequently, we treat any "single versus multiple conspiracy" claim as waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

helps to initiate the agreement and set it in motion, he assumes conspirator's responsibility for the foreseeable actions of his confederates within the scope of the conspiratorial agreement . . . .").

As described in the indictment, the charged conspiracy spanned a period of approximately fourteen months, from June 29, 2000 through August 22, 2001. Several of the discussions pertained to the drug-purchasing phase, and the record supports a finding that Gobbi knew of the full sweep of the conspiracy.[5] Given this configuration, as a whole, we cannot say that the district court erred in determining that evidence of Nardolillo's interest in purchasing a supply of cocaine from "Manny" and distributing those drugs locally with the help of his crew was part of the warp and woof of the conspiracy charged. See, e.g., Villarman-Oviedo, 325 F.3d at 11; United States v. Escobar-de Jesus, 187 F.3d 148, 167-70 (1st Cir. 1999).

2. **Rule 403**. Gobbi's claim of prejudice fares no better. Although the conversations spanned a period of many months, the testimony about them was relatively brief and its

---

[5]Indeed, there was evidence that Gobbi attended at least two meetings (on September 28, 2000 and January 15, 2001) that related to Nardolillo's pursuit of a supply relationship with McGowan's principal; that he frequently acted as a catalyst for conversations between Nardolillo and McGowan in early 2001; and that some of those talks touched upon a proposed drug-purchasing scheme.

effect was more likely to cast Nardolillo, rather than Gobbi, in a villainous light.

This does not mean, of course, that there was absolutely no prejudice. "By design, all evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided." Rodriguez-Estrada, 877 F.2d at 156. The trial judge, who saw and heard the evidence play out, apparently discerned no unfair prejudice here. That implicit determination was well within the realm of his considerable discretion. See id. at 155-56 ("Only rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988))).

## C. **Sentencing**.

In sentencing Gobbi, the district court placed him in criminal history category II; set his base offense level at 34; applied a two-level weapons enhancement, see USSG §2D1.1(b)(1); and added two more levels for obstruction of justice, see id. §3C1.1. These determinations yielded a guideline sentencing range (GSR) of 262-327 months. At the disposition hearing Gobbi, among other things, unsuccessfully objected to the two enhancements. Then, on reasonableness grounds, see United States v. Booker, 543 U.S. 220, 261 (2005); United States v. Jiménez-Beltre, 440 F.3d 514, 518-19

(1st Cir. 2006) (en banc), he requested a sentence between 120 and 180 months. After taking into account the factors limned in 18 U.S.C. § 3553(a), the court determined that a below-the-range sentence was appropriate and imposed a 160-month incarcerative term.

On appeal, Gobbi challenges only the two enhancements.[6] These claims are properly before us; even under an advisory guidelines regime, computation of the guideline sentencing range remains the starting point for sentencing. See United States v. Dixon, 449 F.3d 194, 203-04 (1st Cir. 2006); Jiménez-Beltre, 440 F.3d at 518-19. Accordingly, the sentencing court is still obliged to calculate the GSR — and calculate it correctly.[7]

1. **The Weapons Enhancement**. We begin with the weapons enhancement. Gobbi argues that the district court violated his Fifth and Sixth Amendment rights by applying this enhancement. Since the jury acquitted him on counts 3 and 5 — the counts that charged Gobbi, under 18 U.S.C. § 924(c), with possession of a handgun in furtherance of drug-protection details — he asserts that

---

[6]Since Gobbi does not challenge either his assigned criminal history category or his base offense level, we leave unelucidated the facts underpinning those determinations.

[7]The fact that a district court operating under an advisory guidelines regime, as here, imposes a sentence below the GSR does not moot a defendant's claim of error with respect to the calculation of the range. Cf. United States v. Gregorio, 956 F.2d 341, 342 & n.5 (1st Cir. 1992) (finding appellate jurisdiction where defendant, despite a downward departure, challenged calculation of GSR).

-21-

a sentencing enhancement for the same alleged conduct is impermissible. In Gobbi's view, where conduct constitutes a distinct offense, actually charged as a separate crime and rejected by the jury, that conduct cannot bear the weight of a sentencing enhancement.

The sentencing guidelines provide that a two-level enhancement is proper if "a dangerous weapon (including a firearm) was possessed" in the course of the offense. USSG §2D1.1(b)(1). This provision is applicable whether the weapon is possessed by the defendant himself or by one of his coconspirators. See United States v. Ortiz-Torres, 449 F.3d 61, 77-79 (1st Cir. 2006); see also USSG §1B1.3 (specifying that "all reasonably foreseeable acts" by a defendant's confederates that are "in furtherance of the jointly undertaken criminal activity" may be attributed to the defendant for sentencing purposes as relevant conduct). The enhancement should attach if the weapon was present during the commission of the crime "unless it is clearly improbable that the weapon was connected with the offense." USSG §2D1.1 cmt. n.3.

It is true that the jury acquitted Gobbi of possession of a weapon in violation of 18 U.S.C. § 924(c). Nevertheless, the pre-Booker case law made plain that acquitted conduct, proved to the sentencing court by a preponderance of the evidence, may form the basis of a sentencing enhancement. See, e.g., United States v. Watts, 519 U.S. 148, 157 (1997); United States v. Caba, 241 F.3d

98, 101 (1st Cir. 2001). Post-Booker, the law has not changed in this regard; acquitted conduct, if proved by a preponderance of the evidence, still may form the basis for a sentencing enhancement. See United States v. Dorcely, 454 F.3d 366, 371 (D.C. Cir. 2006) (collecting cases); see also United States v. Baskin, 424 F.3d 1, 4 n.3 (1st Cir. 2005) (adumbrating this result).

That closes the book on this aspect of Gobbi's appeal. The record contains a surfeit of evidence that Falla used a handgun in performing guard duty during the April 30 drug-protection detail; that Gobbi was present when Nardolillo supplied Falla with the gun for that use; that Gobbi encouraged Falla to display the gun as a show of force; that Falla followed these instructions; and that Gobbi helped dispose of the gun following the completion of the job. That is more than enough to ground a finding, by a preponderance of the evidence, that a dangerous weapon was possessed by a coconspirator during and in furtherance of the commission of the offense of conviction. The sentencing court's fact-based determination that the enhancement pertained was, therefore, not clearly erroneous. See Ortiz-Torres, 449 F.3d at 77 (delineating applicable standard of review).

2. **Obstruction of Justice**. Gobbi's remaining challenge is to the sufficiency of the district court's findings in connection with an obstruction of justice enhancement. The district court invoked this enhancement after it determined that

Gobbi had committed perjury when he testified in his defense. See USSG §3C1.1; id. cmt. n.4(b). We review this finding for clear error. See United States v. Akitoye, 923 F.2d 221, 229 (1st Cir. 1991).

At the disposition hearing, the district court stated that, upon review of the record, it had discerned a stark contradiction between Gobbi's trial testimony and the reality of the relevant events. With specific reference to the counts of conviction (counts 1 and 2), the court commented that Gobbi's wholesale denial of any involvement in either the conspiracy or the April 30 drug-protection detail constituted a web of lies. On that basis, the court determined that he had committed perjury and, accordingly, deployed the two-level obstruction of justice enhancement.

Post-Booker, it remains the province of the sentencing court to determine by a preponderance of the evidence whether a factual basis for a finding of perjury (and, thus, for an obstruction of justice enhancement) exists. United States v. O'Brien, 435 F.3d 36, 41 (1st Cir. 2006). It is, of course, improper to impose such an enhancement mechanically, merely because an evidentiary conflict exists or because the jury rejects the defendant's explanation of the facts and finds him guilty. See Akitoye, 923 F.2d at 228-29. The sentencing court must make an independent judgment, see United States v. Dunnigan, 507 U.S. 87,

95 (1993), and in doing so must give the defendant the benefit of any plausible doubt, see Akitoye, 923 F.2d at 228-29.

Here, the trial judge carried out that mandate. He made a careful evaluation of Gobbi's veracity, specified particular concerns, and concluded that Gobbi had lied. Giving due heed to both the trial judge's unique coign of vantage and the deferential standard of review, we uphold his determination that Gobbi deliberately prevaricated about material events in an effort to gain his freedom. The enhancement here was evidenced by more than a garden-variety conflict in trial testimony or a jury's rejection of a defendant's protestation of his innocence.

## III.  CONCLUSION

We need go no further. For the reasons elucidated above, we affirm the judgment below in all particulars.


**Affirmed**.