# United States Court of Appeals
## For the First Circuit

No. 19-1123

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ ANTONIO HERNÁNDEZ-HERNÁNDEZ, a/k/a Vale,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Barron, Lipez, and Dyk,[*]
Circuit Judges.

Rafael F. Castro Lang for appellant.
Gregory B. Conner, Assistant United States Attorney, with
whom Francisco A. Besosa-Martínez, Assistant United States
Attorney, Mariana E. Bauzá-Almonte, Assistant United States
Attorney, Chief, Appellate Division, and W. Stephen Muldrow, United
States Attorney, were on brief, for appellee.

June 30, 2020

_____

[*] Of the Federal Circuit, sitting by designation.

**BARRON**, **Circuit Judge**.  In connection with a 2015 scheme to transport cocaine from the Dominican Republic to Puerto Rico, José Antonio Hernández-Hernández ("Hernández") pleaded guilty to, and was convicted of, two drug-trafficking offenses and two money-laundering offenses in the United States District Court for the District of Puerto Rico.  Hernández now challenges his sentence. We affirm.

**I.**

Hernández was indicted in 2015 on four counts of an eight-count indictment that also charged three others -- Kelvin Radhames De Morla-Santana ("De Morla"), Dima Osiris Gerardino-Manzueta ("Gerardino"), and José Luis Hernández-Peña -- for their respective roles in the drug-trafficking scheme.  Unbeknownst to the conspirators, the individuals on the other side of the planned transaction to bring the cocaine to Puerto Rico and distribute it included federal law enforcement agents.

More specifically, the indictment charged Hernández with one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(ii); one count of attempted possession with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), 18 U.S.C. § 2; and two counts

of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 2.

The government offered Hernández a plea deal.  If he would plead guilty to the first drug-trafficking count and both of the money-laundering counts, then the government would agree to the following in return.  First, the government would stipulate that Hernández was only accountable for offenses involving at least 15 kilograms of cocaine but less than 50 kilograms, even though the conspirators initially agreed to transport 200 kilograms of cocaine to Puerto Rico and actually delivered roughly 60 kilograms of cocaine.  That stipulation would have had favorable sentencing consequences for Hernández under the United States Sentencing Guidelines ("Guidelines") due to the base offense level that corresponds to that stipulated drug quantity. See U.S.S.G. § 2D1.1 (U.S. Sentencing Comm'n 2018) (providing a base offense level of 32 for drug-trafficking offenses involving "[a]t least 15 KG but less than 50 KG of Cocaine"; a base offense level of 34 for drug-trafficking offenses involving "[a]t least 50 KG but less than 150 KG of Cocaine"; and a base offense level of 36 for drug-trafficking offenses involving "[a]t least 150 KG but less than 450 KG of Cocaine").

Second, the government would agree not to pursue a sentencing enhancement under the Guidelines pursuant to U.S.S.G. § 2D1.1(b)(1), based on firearms that had been seized from his

codefendants. That guideline, which requires a two-level enhancement, applies when "a dangerous weapon (including a firearm) was possessed" in relation to the defendant's offense if it involved drugs. Id.

Under this proposed deal, all three counts would have been grouped for Guidelines calculation purposes. See U.S.S.G. § 3D1.2(c) (explaining that counts should be grouped "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts"). Thus, his base offense level under the Guidelines would have been 32. See U.S.S.G. § 2D1.1.

The government anticipated, moreover, that Hernández's total offense level under this deal would have been 33. That was so because the government intended to request a two-level enhancement under U.S.S.G. § 3B1.1, which allows for an increase of two or four levels for a "leader" or "organizer" of "a criminal activity" depending on whether that activity was "extensive"; a two-level enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B), which imposes a two-level increase for a defendant who was also convicted of a money-laundering offense pursuant to 18 U.S.C. § 1956; and a three-level reduction for his acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a)-(b).

If Hernández had accepted this plea deal, given his expected total offense level of 33 and his criminal history category of I, his recommended sentencing range, per the Guidelines, would have been 135-168 months of imprisonment. Hernández, however, rejected the plea deal. He would not agree to the application of the sentencing enhancement for being a leader or organizer of criminal activity under U.S.S.G. § 3B1.1. He instead entered a straight plea of guilty to each of the four counts for which he had been charged in the indictment.

The United States Probation Office prepared a presentence report ("PSR") based on Hernández's straight guilty plea. Hernández filed various objections to it.

First, Hernández objected to the sentencing enhancement of four levels that the PSR applied for his role as a leader or organizer of an extensive criminal activity under U.S.S.G. § 3B1.1(a). See U.S.S.G. § 3B1.1(a) ("If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.").

Second, Hernández objected to the two-level enhancement under U.S.S.G. § 2D1.1(b)(1) that the PSR applied based on the firearms seized from his codefendants. He argued that only his codefendants had been in possession of the firearms on which the

enhancement was premised and that he could not have foreseen his codefendants' possession of them.

Finally, Hernández disputed the PSR's finding that his drug-trafficking offenses involved 200 kilograms of cocaine and thus that his base offense level was 36.  He argued that, even though the venture was originally set to transport that amount of cocaine, the offenses only involved the 60 kilograms of cocaine that were actually delivered, which meant that his base offense level should be 34.  See U.S.S.G. § 2D1.1(c) (providing a base offense level of 34 for offenses involving between 50-150 kilograms of cocaine, and a base offense level of 36 for offenses involving 150-450 kilograms of cocaine).

The Probation Office amended the PSR to find Hernández responsible for 60 kilograms of cocaine rather than 200 kilograms. The amended PSR thus, after grouping all four counts pursuant to U.S.S.G. § 3D1.2(c), calculated his base offense level to be 34, see U.S.S.G. § 2D1.1(c)(3).

The amended PSR then applied a four-level enhancement for Hernández's role as a leader or organizer, pursuant to U.S.S.G. § 3B1.1(a), as well as an enhancement pursuant to U.S.S.G. § 2D1.1(b)(15)(C).[1]  The latter guideline provides for a two-level

_____

[1] Although the Sentencing Guidelines in effect when the amended PSR was prepared in 2016 listed this enhancement under § 2D1.1(b)(15)(C), in the Guidelines in effect at Hernández's

- 6 -

enhancement when a defendant "receives an adjustment under §3B1.1" and "the defendant was directly involved in the importation of a controlled substance." Id. The application of each of those enhancements brought Hernández's total offense level to 40.

The amended PSR also applied two more enhancements. It applied the two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1), in connection with Hernández's coconspirators' firearms possession. It then applied the two-level enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because of Hernández's money-laundering convictions under 18 U.S.C. § 1956. The application of these two additional enhancements brought his total offense level to 44.

The amended PSR, however, also made one more adjustment -- this time to Hernández's benefit. It applied a three-level reduction for his acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a)-(b).

That adjustment reduced his total offense level to 41. His criminal history category was I. The result was that the amended PSR's recommended guideline sentencing range was 324-405 months of imprisonment.

After receiving the amended PSR, Hernández objected again. He challenged the application of the leader or organizer

_____

sentencing in 2019, that same enhancement is provided at § 2D1.1(b)(16)(C).

- 7 -

enhancement, U.S.S.G. § 3B1.1(a), arguing that instead of an enhancement he deserved a two-level reduction pursuant to § 3B1.2(b) because his role was only that of a "minor" participant. He also challenged the dangerous weapon enhancement under U.S.S.G. § 2D1.1(b)(1). Hernández additionally requested that he be given a two-level safety-valve reduction pursuant to U.S.S.G. § 5C1.2, which mitigates the harsh effect of mandatory minimum sentences on certain first-time offenders who played only supporting roles in drug-trafficking schemes and who provided testimony about their involvement in the criminal activity. See United States v. Ortiz-Santiago, 211 F.3d 146, 150-51 (1st Cir. 2000).

The government, for its part, disputed the amended PSR's drug quantity determination. It argued that Hernández's sentence should be based on a base offense level that reflected the entire 200 kilograms of cocaine that he originally promised to traffic rather than only the 60 kilograms that were delivered.

The District Court accepted the defendant's guilty plea. With respect to sentencing, the District Court initially followed the government's recommendation and found that the drug quantity was 200 kilograms of cocaine rather than the amended PSR's recommended 60 kilograms. Accordingly, the District Court found that Hernández had a base offense level of 36 rather than 34, as the amended PSR had determined it to be. See U.S.S.G. § 2D1.1(c)(2) (providing a base offense level of 36 for

drug-trafficking offenses involving "[a]t least 150 KG but less than 450 KG of Cocaine").  The District Court then followed the amended PSR, however, by applying the same sentencing enhancements and reductions that it had recommended.

The District Court found that the four-level enhancement pursuant to U.S.S.G. § 3B1.1(a) for a leader or organizer applied because the defendant was an "organizer" and "the criminal activity involved five or more participants, and also . . . was extensive." That finding, in turn, along with other reasons, caused the District Court to reject Hernández's request for a safety-valve reduction of two levels.  But, that finding also resulted in the District Court applying the two-level enhancement set forth in U.S.S.G. § 2D1.1(b)(16)(C), which calls for those additional levels to be added to a defendant's offense level when § 3B1.1(a) applies and the offense involves the importation of controlled substances.

With the total offense level then at 42, the District Court applied two additional two-level enhancements.  One was the weapons enhancement pursuant to U.S.S.G. § 2D1.1(b)(1), and the other was the enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B), which was based on Hernández's money-laundering convictions. Those enhancements brought the total offense level to 46.

Finally, the District Court applied the three-level reduction for acceptance of responsibility pursuant to U.S.S.G.

- 9 -

§ 3E1.1(a)-(b). That adjustment resulted in a total offense level of 43 rather than 41, which the amended PSR had calculated it to be.

With this total offense level, and a criminal history category of I, Hernández's recommended guideline sentencing range was, the District Court noted, life imprisonment. But, the District Court decided to apply a two-level downward variance by "assuming" for sentencing purposes (notwithstanding its earlier factual finding that the drug quantity involved in the drug trafficking offenses was 200 and not merely 60 kilograms of cocaine) that, consistent with the amended PSR's calculation, Hernández's drug-trafficking offenses only involved "at least 50 kilos, but less than 150 kilos of cocaine," which would bring Hernández's base offense level down to 34. See U.S.S.G. § 2D1.1(c)(3).

Thus, after grouping Hernández's counts of conviction pursuant to § 3D1.2(c), the District Court applied Hernández's sentencing enhancements to the base offense level of 34, resulting in a total offense level of 41. Hernández's resulting Guidelines sentencing range was 324-405 months of imprisonment, which is the range for a person with that total offense level and a criminal history category of I. The District Court then applied the § 3553(a) sentencing factors and sentenced Hernández to 324 months of imprisonment for the drug-trafficking counts and 240 months of

imprisonment for the money-laundering counts, to be served concurrently.

Hernández timely appealed his sentence.

## II.

We start with Hernández's contention that the District Court committed procedural errors in calculating his Guidelines sentencing range. The alleged errors concern the application of the various enhancements to which he had objected below, as well as the District Court's refusal to apply one of the downward adjustments that he had requested. Because Hernández was sentenced in 2019, we apply the Guidelines in effect at that time, which were the 2018 Guidelines. See United States v. Crudup, 375 F.3d 5, 8 (1st Cir. 2004) ("Normally, the sentencing judge is to apply the guidelines version in effect at the time of sentencing."). We find no merit to these challenges.

## A.

Hernández first challenges the four-level "leader or organizer" enhancement that the District Court applied pursuant to U.S.S.G § 3B1.1(a). This enhancement requires a district court to make "both a status determination -- a finding that the defendant acted as an organizer or leader of the criminal activity -- and a scope determination -- a finding that the criminal activity met either the numerosity or the extensiveness benchmarks established

- 11 -

by the guideline." United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995).

The District Court found that Hernández satisfied the status requirement based on a finding that he was an "organizer." The District Court also found that the scope requirement was met because "the criminal activity involved five or more participants."

On appeal, Hernández does not contest the District Court's scope finding. Thus, the only question for us concerns Hernández's status: was he an "organizer" of the criminal activity?

To qualify as an "organizer," "the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime." United States v. Carrero-Hernández, 643 F.3d 344, 350 (1st Cir. 2011) (quoting United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir. 1990)). Specifically, the defendant "must have been the organizer" not only of the general activity but also "of one or more other participants" who were not "undercover law enforcement officer[s]." U.S.S.G. § 3B1.1(a) cmts. nn.1-2; see United States v. Arbour, 559 F.3d 50, 56 (1st Cir. 2009) ("[T]he guideline commentary makes plain that a defendant needs only to have led or organized one criminal participant, besides himself of course, to

qualify as a leader or organizer under § 3B1.1(a)."). Importantly, "our cases distinguish between organizing criminal activities and organizing criminal actors. Only the latter may be used to ground an enhancement under § 3B1.1(a)." Carrero-Hernández, 643 F.3d at 350-51 (footnote omitted).

As we will explain, the District Court found that Hernández, in the course of facilitating various aspects of the drug-trafficking scheme, gave significant "instructions" to at least one of his codefendants to help ensure the transfer within Puerto Rico of what he thought was cocaine (although, by that time, the undercover law enforcement agents had ensured that it was actually fake). We review that factual finding for clear error, see United States v. Walker, 665 F.3d 212, 232 (1st Cir. 2011), and we conclude that the District Court did not clearly err in making it, see United States v. Belanger, 890 F.3d 13, 36 (1st Cir. 2018) ("Clear error cannot be said to exist unless 'on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed.'" (alteration in original) (quoting United States v. Brown, 298 F.3d 120, 122 (1st Cir. 2002))); see also United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990) ("[W]here there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous."). For that reason, although the evidence of Hernández's general coordination of

- 13 -

criminal activities is not itself enough to show that he was an "organizer," the entire record evidence suffices to show that the District Court did not err in finding that he was.

The District Court did not specify the "instructions" that it had in mind in finding that Hernández gave them. In its brief to us, though, the government asserts that these "instructions" included Hernández's direction to one of his codefendants (and thus not an undercover agent) to drive the car that was supposed to contain the cocaine that had been brought to Puerto Rico so that it could be transferred to facilitate its distribution.

Hernández does not dispute the government on this point. Thus, the key question for us is whether the record suffices to support the District Court's finding that Hernández gave that key instruction to a codefendant to facilitate the venture. We conclude that it does.

It is undisputed that Hernández thought that he was coordinating the sea-transfer of cocaine to an individual who went by the name "Looney Tunes," who would then bring the cocaine into the Commonwealth, where it would be picked up for future distribution. Unbeknownst to Hernández, however, Looney Tunes was in fact not a single individual but a group of undercover Homeland Security Investigations ("HSI") agents. According to the record, Hernández's communications with Looney Tunes throughout the

venture were extensive. They concerned both the coordination of the initial transfer of what was then real cocaine at sea from Hernández's associates to Looney Tunes so that it could be brought to Puerto Rico, as well as the planned transfer of it (though, by then the undercover agents had swapped in sham cocaine) within the Commonwealth from Looney Tunes back to Hernández's other associates.[2] It was in the course of carrying out that second planned transfer of the cocaine that, the record supportably shows, Hernández gave the "instruction" that provides the sufficient basis for the District Court's "organizer" finding.

After Hernández reached out to Looney Tunes to coordinate the transfer in Puerto Rico of what he thought was real cocaine for cash, the record shows, Looney Tunes told Hernández that the exchange would happen at the Pep Boys Auto Store at Altamira in Guaynabo, Puerto Rico. At the appointed time, the record further shows, Hernández and his codefendant, José Luis

---

[2] The record shows that Hernández had many communications with Looney Tunes via BlackBerry messenger. These communications included the coordination of the sea transfer of cocaine from Hernández's associates, who arrived in a boat coming from the Dominican Republic, to Looney Tunes, who came in a boat from Puerto Rico. The record also shows that these communications resulted in an agreement as to the amount of money that Hernández would pay Looney Tunes for fuel expenses during the transfer at sea. And, the record shows that when Hernández's associates who were aboard their vessel from the Dominican Republic transferred only approximately 60 kilograms of cocaine to Looney Tunes rather than the promised 200 kilograms, it was Hernández who messaged with Looney Tunes to sort out the disparity.

Hernández-Peña, arrived in a Honda and parked at the Pep Boys Auto Store, while another codefendant, Gerardino, arrived in a Mazda.

At that point, the record reveals, an HSI undercover agent whom Hernández thought was Looney Tunes told him that the exchange spot to transfer the cocaine was being moved to the Tren Urbano Martinez Nadal Station parking lot in Guaynabo. The record shows that the following then transpired: Hernández exited the Honda and got into the Mazda, which Gerardino was driving, and the two men, together, then left the Pep Boys Auto Store parking lot in the Mazda and drove to the Tren Urbano Martinez Nadal Station parking lot.

According to the record, the HSI agent posing as Looney Tunes informed Hernández -- exactly when is not clear -- that the cocaine was inside a Ford Expedition that was parked at the Martinez Nadal Station parking lot and that he should retrieve the keys from the Ford and drive away in it. Significantly, the record as presented on appeal does not indicate that the instruction from the undercover agent to Hernández to get in the Ford and drive away in it gave as an option that Hernández should instruct Gerardino to do so in his stead. Nevertheless, the record shows, after the agent had transmitted this instruction to Hernández about getting into the Ford, it was Gerardino and not Hernández who got out of the Mazda, entered the Ford that had the sham cocaine, and then attempted to drive away in it.

Thus, the record permits the inference that Hernández had instructed Gerardino to get into the Ford that contained the sham cocaine and drive away in it and that Hernández had done so on his own initiative rather than at another's direction. To be sure, there is no direct evidence that Hernández gave this instruction directing a coconspirator to carry out this critical aspect of the venture or that in doing so he exercised his own discretion. But, the inference that he chose to give that key instruction at that critical moment on his own initiative draws strength not only from the discrete sequence of events just described concerning what happened in Puerto Rico but also from the District Court's amply supported finding that Hernández "had a complete understanding of the totality of the activity, before and after," of the venture as a whole and thus that he was not merely a bit player operating at its margins.

In disputing that the record supportably shows that Hernández gave this instruction, Hernández does not contest that he was instructed by the agents to drive the Ford that had the sham cocaine or that, in the end, Gerardino was the one driving it. He even admits that "[t]he agents instructed [him] to take the Ford pick-up parked at the train station which had the drugs inside and to leave the car in which he arrived with the money

- 17 -

inside."[3]  But, he contends, the sworn statement from Gerardino that he rather than Hernández was "following the instructions of another individual" when he rather than Hernández "went to exchange the red Mazda for another vehicle" shows that, contrary to the District Court's finding, Hernández did not "control[]" or "exercise[] decision-making authority" over his coconspirator in that instance.

We may assume to Hernández's benefit that Gerardino's statement is best read to imply that the "another individual" to whom he referred was not Hernández.  But, even if we make that assumption, we still conclude that the District Court did not clearly err in finding as it did as to Hernández giving this instruction.

The District Court could reasonably have disregarded such a statement from Gerardino as not credible.  United States v. Appolon, 695 F.3d 44, 66 (1st Cir. 2012) ("[W]here there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous.").  After all, Hernández fails to point to any evidence in the record that indicates that the "individual" to whom

_____

[3] Hernández also said the agents "directed [Hernández] to a van parked at the train station and gave him instructions to retrieve the car keys from the van's fueling area and drive away in the van and to leave the Mazda CX-7 with the money in the parking lot."

Gerardino referred was anyone but Hernández, as nothing in the record indicates that Gerardino was in contact at that time with anyone other than Hernández.  By contrast, the evidence does show that Hernández was the contact for Looney Tunes and had communicated directly with him at the key moment about getting into the Ford and driving it away.

We therefore conclude that the record evidence supportably shows that Hernández, acting on his own initiative, instructed Gerardino "to exchange the red Mazda for another vehicle" and thus that the District Court did not clearly err in finding that Hernández "gave instructions."  Accordingly, because the District Court supportably found that Hernández instructed a coconspirator (and not an undercover agent) to perform this key task in this criminal venture, we agree with the government that the District Court committed no error in applying the four-level sentencing enhancement pursuant to U.S.S.G. § 3B1.1(a), based on a finding that Hernández was an "organizer."

**B.**

Hernández next argues that the District Court erred in adding an additional two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(16).  That enhancement states:  "If the defendant receives an adjustment under § 3B1.1 (Aggravating Role) and the offense involved 1 or more of the following factors . . . [including that] the defendant was directly involved in the

importation of a controlled substance . . . [then] increase by 2 levels."  We have just explained, though, that the District Court did not err in applying the § 3B1.1 enhancement due to Hernández's status as an organizer.  Thus, this challenge fails, as Hernández does not challenge the application of this enhancement on any other ground.

## C.

Hernández also challenges the District Court's refusal to apply the so-called safety-valve reduction, which would reduce his total offense level by two levels if it were applicable.  See U.S.S.G. § 5C1.2; 18 U.S.C. § 3553(f).  A prerequisite to eligibility for the safety-valve reduction, however, is that "the defendant was not an organizer, leader, manager, or supervisor of others in the offense."  U.S.S.G. § 5C1.2(a)(4).  Because the District Court supportably found that Hernández was an "organizer," he is not eligible for this reduction.  Thus, this challenge also fails.

## D.

That brings us to Hernández's challenge to the two-level enhancement that the District Court imposed under U.S.S.G. § 2D1.1(b)(1), which applies "[i]f a dangerous weapon (including a firearm) was possessed."  We review the District Court's interpretation and application of the Guidelines de novo, and its

factual findings for clear error.  See United States v. Nuñez, 840 F.3d 1, 4 (1st Cir. 2016).

This enhancement "is applicable whether the weapon is possessed by the defendant himself or by one of his coconspirators."  United States v. Gobbi, 471 F.3d 302, 313 (1st Cir. 2006).  Hernández does not dispute that although he was not found to be in possession of a weapon himself, his codefendants, Gerardino and De Morla, arrived at the location of the drug transfer with weapons in their vehicles.  He argues, however, that because he was unaware that his codefendants possessed firearms, the District Court erred in applying the enhancement.  We do not agree.

So long as it is "reasonably foreseeable that a co-conspirator would possess a weapon in furtherance of the criminal activity," a defendant need not actually be aware of the existence of his coconspirator's weapon for the enhancement to apply.  United States v. Greig, 717 F.3d 212, 219 (1st Cir. 2013).  In addition, as we have explained before, "[a]bsent evidence of exceptional circumstances, we think it fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash."  United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991); see also United States v. Miranda-Martinez, 790 F.3d 270,

276 (1st Cir. 2015) (explaining that "firearms are common tools" in drug-trafficking schemes (quoting Bianco, 922 F.2d at 912)). Moreover, once it has been shown that a coconspirator possessed a firearm during an offense and that it was reasonably foreseeable to the defendant for the coconspirator to do so, "[t]he enhancement should be applied . . . unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1) cmt. n.11(A).

The District Court did not clearly err in determining that at least one of Hernández's "[co]conspirators possessed a weapon during the offense" and that "it was foreseeable to have that weapon present during the exchange" because "[t]his was a very dangerous situation dealing with [and] involving significant amount[s] of drugs and money." In fact, far from pointing to any such exceptional circumstances here that could compel a different conclusion than the one the District Court reached on that score, Hernández admitted the situation was "extremely dangerous" because the individuals on the other side of the drug-trafficking scheme were "dangerous." Nor can Hernández show that he had met his burden to demonstrate that it was "clearly improbable" that the weapons involved were related to the drug-trafficking scheme, see United States v. Anderson, 452 F.3d 87, 91 (1st Cir. 2006) (explaining that "once the government shows that the firearm was present during the commission of the offense," the defendant must

meet the "heav[y] burden . . . of establishing that it was <u>clearly</u> <u>improbable</u> that the gun was used in connection with the offense"), as his bare assertion that he was unaware that his codefendants were carrying firearms is not sufficient to do so. <u>See</u> U.S.S.G. § 2D1.1(b)(1) cmt. n.11(A). Thus, the District Court committed no error in applying this sentencing enhancement. <u>See</u> <u>Greig</u>, 717 F.3d at 219.

## E.

Hernández's final procedural challenge to his sentence is that the District Court erred in initially finding that his drug-trafficking offenses involved 200 kilograms of cocaine. We agree with the government, however, that any error was harmless. The District Court, as we have explained, ultimately varied downward by sentencing him as if the offenses involved only 60 kilograms of cocaine. The District Court thus imposed Hernández's sentence as if the base offense level that he contends applies -- 34 rather than 36 -- did apply. Nor does the record indicate that the District Court would have varied downward even more if it had initially found that Hernández's drug-trafficking offenses involved 60 kilograms of cocaine rather than 200 kilograms. <u>See</u> <u>Williams</u> v. <u>United States</u>, 503 U.S. 193, 202-03

(1992) (explaining that if "the district court would have imposed the same sentence" even without the error, it was harmless).

### III.

Hernández's final challenge to his sentence is that it is substantively unreasonable under 18 U.S.C. § 3553(a)(6), which directs district courts "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Hernández bases his argument on the fact that his 324-month prison sentence for his drug-trafficking crimes is significantly longer than the prison sentences of his codefendants, Gerardino and De Morla. They were sentenced, respectively, to 123 months and 120 months of imprisonment, while Hernández was sentenced to 324 months.

We review preserved challenges to the substantive reasonableness of a sentence for abuse of discretion. See United States v. Viloria-Sepulveda, 921 F.3d 5, 8 (1st Cir. 2019). "A sentence is substantively reasonable so long as it rests on a plausible sentencing rationale and embodies a defensible result." United States v. Ruiz-Huertas, 792 F.3d 223, 228 (1st Cir. 2015) (internal quotation marks omitted).

Section 3553(a)(6) warns against disparate sentences for similarly situated codefendants, but "a district court may consider differences and similarities between co-defendants at sentencing." United States v. Marceau, 554 F.3d 24, 33 (1st Cir.

2009).  In this case, Hernández was both convicted of offenses that his codefendants were not and declined to enter into a plea agreement while his codefendants did.  In light of these differences between Hernández and his codefendants, we must reject his disparity challenge.

## IV.

For the reasons stated, we **<u>affirm</u>** Hernández's sentence.