# United States Court of Appeals
## For the First Circuit

No. 21-1583

UNITED STATES OF AMERICA,

Appellee,

v.

ABDIRASHID AHMED,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Daniel Dube, with whom Peter E. Rodway was on brief, for appellant.
Lindsay B. Feinberg, Assistant United States Attorney, with whom Darcie N. McElwee, United States Attorney, was on brief, for appellee.

October 12, 2022

**LYNCH**, **Circuit Judge**. Abdirashid Ahmed pleaded guilty to health care fraud in connection with a multiyear scheme to defraud MaineCare, the state run program that administers Medicaid benefits in Maine and reimburses health care providers for MaineCare services. See 18 U.S.C. § 1347; see also Me. Rev. Stat. Ann. tit. 22, § 3173 (establishing MaineCare). The district court sentenced him to twenty-four months' imprisonment. His appeal challenges the procedural and substantive reasonableness of that sentence. We affirm.

I.

A.

Because this appeal follows a guilty plea, "we draw the facts from the plea colloquy, the unchallenged portions of the presentence investigation report [(PSR)], . . . the transcript of the sentencing hearing," and the parties' sentencing memoranda and exhibits. United States v. De la Cruz, 998 F.3d 508, 509 (1st Cir. 2021) (quoting United States v. Padilla-Colón, 578 F.3d 23, 25 (1st Cir. 2009)); see United States v. Lee, 892 F.3d 488, 490 n.1 (1st Cir. 2018).

MaineCare reimburses approved providers for covered health care services for MaineCare clients. See Me. Rev. Stat. Ann. tit. 22, § 3173; 10-144 Me. Code R. ch. 101, ch. I, § 1.06. Part of the reimbursement to providers is for the costs of interpreter services "necessary and reasonable to communicate

effectively with [MaineCare] members regarding health needs." 10-144 Me. Code R. ch. 101, ch. I, § 1.06-2(A). All claims must be submitted by the provider, who then compensates the interpreter. See id. § 1.06-2(A), (D), (F). MaineCare rules forbid false or fraudulent reimbursement claims. See id. § 1.20-1. MaineCare providers typically track time in fifteen-minute "unit[s]." See id. § 1.03-8(M)(2).

Ahmed, a naturalized U.S. citizen born in Somalia, became a certified Somali-English translator in 2014. From late 2014 to approximately April 2018, Ahmed, as an interpreter with various mental health counseling providers, defrauded MaineCare through fraudulent reimbursement claims made for mental health treatment and interpreter services. Ahmed (and another Somali interpreter, Garat Osman, who joined the conspiracy in 2016) would purport to bring the provider Somali MaineCare beneficiaries. The provider then submitted to MaineCare inflated or otherwise falsified reimbursement requests -- including claims for interpreter services -- involving the beneficiaries and paid Ahmed (and Osman) for the interpreter services supposedly provided.

One MaineCare provider with whom Ahmed admitted to conspiring, Elizabeth Daigle, began submitting fraudulent claims in late 2014.[1] Each claim sought reimbursement for a client visit

---

[1] Daigle cooperated with the investigation into Ahmed's conduct. The record does not disclose whether she was ever charged

that purportedly employed Ahmed's interpretive services and lasted 2.5 hours, when in fact the visits were far shorter in length. This activity continued until Daigle went on maternity leave in December 2014.

While Daigle was on maternity leave, another MaineCare provider, Heather Borst, filled in at her practice. From January 2015 until June 2017, Borst continued the overbilling, submitting almost exclusively claims for 2.5-hour visits, 80% of which purportedly required interpreter services.[2] Borst frequently submitted claims, including inflated claims for Ahmed's interpretive services, for over 10 hours of service per day, and on at least one occasion billed for over 24 hours in a single day. When approached by investigators in June 2017, Borst admitted to frequently falsifying claims, including for visits that never happened or that were much shorter than her reimbursement claims showed. She told investigators that Ahmed had instructed her always to bill for 2.5 hours. With Borst's cooperation, investigators recorded a conversation among Borst, Ahmed, and Osman in which Ahmed agreed to bring Somali patients to Borst for short visits (lasting about 15 minutes) that Borst would

---

with or convicted of a crime related to her participation in the conspiracy.

[2] Borst later pleaded guilty to one count of conspiring to defraud a health care program, see 18 U.S.C. §§ 1347, 1349, and cooperated with the investigation of Ahmed.

nonetheless claim in reimbursements to have lasted 1.75 hours. Ahmed and Osman followed through on this agreement in the following few days by bringing Somali clients to Borst's office for brief visits; Borst then billed MaineCare for 1.75-hour sessions and paid Ahmed and Osman with law enforcement funds.

A third provider, a behavioral health agency named Facing Change, P.A., also worked with Ahmed to defraud MaineCare.[3] From February 2015 until approximately May 2016, the agency paid Ahmed a 10% premium above his hourly rate in exchange for referring his Somali clients to Facing Change. Beginning in late 2015, Facing Change staff also began submitting false claims to MaineCare for patient visits -- in which Ahmed purportedly served as an interpreter -- that did not occur, were of shorter duration than reported, or involved falsified patient diagnoses. This activity continued until roughly April 2018.

In total, the providers billed -- and MaineCare paid -- over $1.8 million in connection with the fraudulent claims. Ahmed

---

[3] Facing Change's owner, Nancy Ludwig, was indicted as Ahmed's codefendant and ultimately convicted after a jury trial of one count of conspiracy to commit health care fraud, see 18 U.S.C. §§ 1347, 1349; one count of conspiracy to receive and pay health care kickbacks, see id. § 371; 42 U.S.C. § 1320a-7b(b); five counts of offering/paying health care kickbacks, see 42 U.S.C. § 1320a-7b(b)(2); one count of false statements relating to a health care benefit program, see 18 U.S.C. § 1035; and one count of obstruction of a federal audit, see id. § 1516. Multiple other Facing Change employees pleaded guilty to various charges related to the conspiracy and cooperated with the investigation.

acknowledges that throughout the conspiracy "he often pressed [providers] to overbill for translation services," and he does not dispute that "his gross proceeds over time were larger than the other participants[']."

B.

On April 27, 2018, a federal grand jury indicted Ahmed and Osman on one count of conspiracy to commit health care fraud, see 18 U.S.C. §§ 1347, 1349; one count of conspiracy to defraud the United States and to pay and receive health care kickbacks, see id. § 371; 42 U.S.C. § 1320a-7b(b)(1); and six counts of receiving health care kickbacks, see 42 U.S.C. § 1320a-7b(b)(1). On November 16, 2018, a grand jury returned a superseding indictment, which added a codefendant -- Nancy Ludwig, the owner of Facing Change -- and charged Ahmed with eighteen total counts: one count of health care fraud, see 18 U.S.C. § 1347; three counts of conspiracy to commit health care fraud, see id. §§ 1347, 1349; two counts of conspiracy to receive and pay health care kickbacks, see id. § 371; 42 U.S.C. § 1320a-7b(b); and twelve counts of receiving health care kickbacks, see 42 U.S.C. § 1320a-7b(b)(1).

After initially pleading not guilty on all counts, Ahmed, during a May 24, 2019 change of plea hearing, pleaded guilty to the first count of the superseding indictment.[4]  Although

---

[4]    The first count of the superseding indictment charged Ahmed with health care fraud in violation of 18 U.S.C. § 1347.  As

Ahmed's guilty plea was not pursuant to a written plea agreement, the government orally agreed to dismiss the remaining counts at sentencing in exchange for Ahmed's plea.

On October 17, 2019, the probation officer issued an initial PSR. The initial PSR determined that the total loss amount attributable to Ahmed was $1,020,073.79. This loss amount resulted in an increase of 16 levels in Ahmed's Total Offense Level: 14 levels for a loss amount over $550,000 but not more than $1.5 million, and 2 additional levels because Ahmed was convicted of a federal health care offense involving a federal health care program with a loss amount over $1 million. See U.S. Sent'g Guidelines Manual § 2B1.1(b)(1)(I), (b)(7) (U.S. Sent'g Comm'n 2018) [hereinafter U.S.S.G.]. The report also recommended a four-level role enhancement because Ahmed "was a leader or organizer of a criminal activity that involved five or more participants." See

the government notes in a footnote in its brief, however, the judgment ultimately issued by the district court and the revised PSR developed by the probation officer "indicate that Ahmed [pleaded] guilty to conspiracy to commit healthcare fraud," rather than "a substantive count of health care fraud." The government requests "a limited remand to permit the district court to correct the clerical error in the judgment." The record suggests that the government is correct that a clerical error occurred. Under Federal Rule of Criminal Procedure 36, "the [district] court may at any time correct a clerical error in the judgment," and the parties may move it to do so. See United States v. Claudio, 44 F.3d 10, 16-17 (1st Cir. 1995); see also, e.g., United States v. Davis, 841 F.3d 1253, 1265 (11th Cir. 2016) (affirming correction of offense listed in judgment under Rule 36). We remand to permit the parties to address the district court on this issue.

- 7 -

id. § 3B1.1(a). Based on these calculations, the initial PSR recommended a Total Offense Level of 23, which, given Ahmed's Criminal History Category of I, corresponded to a Guidelines sentencing range (GSR) of 46 to 57 months.

Both the government and Ahmed filed objections to the initial PSR. Based on a new assessment by a loss analyst, the government asserted that a higher loss amount applied. The defense, conversely, argued both that the loss amount was too high and that the role enhancement was inappropriate. In particular, the defense contended that the loss amount should be offset by the value of any interpreter services Ahmed actually provided and that it should not include the sums MaineCare paid for provider services, rather than interpreter services.

In response to these objections, the probation officer issued a revised PSR on November 12, 2019. The revised report adopted the government's updated loss amount by changing the total to $1,267,309.33,[5] but -- beyond adding some clarifying language -- rejected Ahmed's objections. The revisions did not affect the Total Offense Level or GSR, which remained 23 and 46 to 57 months, respectively.

---

[5] In briefing both before the district court and on appeal, the government contends that the revised PSR did not accurately adopt the government's proposed loss amount and that the government's figure was higher than the $1,267,309.33 given in the revised report.

Following the revised PSR's issuance, the parties continued to litigate the loss amount and role enhancement issues through multiple rounds of briefing and a series of hearings. During this process, both parties submitted evidence, including provider billing records; materials generated by law enforcement during the investigation of the conspiracy; reports from law enforcement interviews with the providers with whom Ahmed conspired; and transcripts of grand jury and trial testimony from the government's prosecution of Ahmed's coconspirator, Ludwig. The substance of this evidence is discussed in more detail below.

The government maintained that the four-level role enhancement was warranted and that the loss amount should include the amounts fraudulently billed by providers for their own services as part of the conspiracy in addition to the amount billed for Ahmed's interpreter services. The government also contended that Ahmed was not entitled to offset the loss amount by the value of interpreter services actually delivered, as he had failed to show that he provided legitimate interpreter services in connection with MaineCare reimbursable treatment. The exact loss amount proposed by the government varied over time; at sentencing, the government submitted a figure of $1,863,264.85, which, together with the four-level role enhancement, corresponded to a Total Offense Level of 25.

Ahmed argued for a lower loss amount and against the application of a leader/organizer role enhancement. On loss amount, he asserted that he should receive credit for interpreter services actually provided and that he should not be held responsible for overbilling by providers for their own services (as opposed to his interpreter work), because that overbilling was not foreseeable to him. After discounting for the amount of interpreter services he estimated himself to have provided and excluding charges for the providers' services, Ahmed proposed a loss amount of $436,195. Regarding the role enhancement, Ahmed asserted that he lacked the necessary control over the providers -- whom he characterized as "gatekeepers" without whose cooperation he could not independently bill MaineCare for interpreter services -- to qualify as a leader or organizer. His counsel did acknowledge, however, that this "argument [was] less forceful about whether [Ahmed] was a manager/supervisor" for whom a three-level enhancement under U.S.S.G. § 3B1.1(b) would be appropriate, because "it did appear that [Ahmed] . . . was a manager or supervisor of . . . Osman." Ahmed's proposed Guidelines calculations would have resulted in a Total Offense Level of 15.

At Ahmed's sentencing hearing, conducted on July 16, 2021, the district court adopted the government's loss amount of $1,863,264.85 and found that the four-level leader/organizer enhancement was appropriate. In addressing loss amount, the court

- 10 -

rejected Ahmed's offset and foreseeability arguments. Regarding offset, the court reasoned that Ahmed bore the burden of producing "evidence to show . . . what amounts represent[ed] legitimate claims," see United States v. Alphas, 785 F.3d 775, 784 (1st Cir. 2015), and concluded that Ahmed had not supported his assertion that he performed any reimbursable interpreter services in connection with covered MaineCare services. Regarding foreseeability, the court found that Ahmed "knew or should have known that the providers could only seek reimbursement for interpreter services in the same units of time as they sought reimbursement for the counseling services," and that "it was entirely foreseeable that the providers' records . . . would not be accurate," so "the amounts paid with respect to [the providers'] claims [were] fairly attributable to . . . Ahmed."

In applying the leader/organizer enhancement, the court found that "Ahmed was the common denominator as between the three counseling practices that participated in fraudulent billing"; "was involved from the very beginning" of the fraud; "was a critically important driving force" in the conspiracy, even if "not the sole driving force"; "cajoled, encouraged, and pressured others to participate in the scheme"; "influence[d] the amounts that were billed" through "his control over the clients and his demands regarding the number of units that had to be billed"; and "personally received the largest share of the crime proceeds."

The court also noted that "there certainly [was] evidence that . . . Osman was in some respects subservient to . . . Ahmed."

Based on those rulings, the court determined that Ahmed's Total Offense Level was 25, with a corresponding GSR of 57 to 71 months.

The court then turned to imposing Ahmed's sentence. It announced that it had "considered all [the 18 U.S.C. § 3553(a) sentencing] factors," and gave detailed descriptions of its reasoning with respect to several of those factors. It highlighted the "very serious" nature of the crime, which involved a "long-standing, carefully planned and executed, flagrant scheme to defraud the government motivated by greed." It also discussed the need for the sentence "to afford adequate deterrence from criminal conduct, both by . . . Ahmed [and] by the general public," which the court felt was "quite important" because "[t]he fraud in this case lasted years and perhaps expose[d] . . . the weaknesses of the MaineCare system or its exposure to fraud going undetected." In addition, the court acknowledged Ahmed's personal circumstances -- particularly his "parental responsibilities" as the father of "seven minor children," one of whom "requires an adult to care for him every waking moment" due to "autism spectrum disorder and anxiety." The court reasoned that these personal circumstances "supported" a downward variance from the GSR. It

concluded that twenty-four months' imprisonment was "a just and fair sentence."

After announcing this sentence, the district court further stated:

> I want the record to reflect that I have carefully weighed all the defendant's arguments regarding the [G]uidelines as they affect his total offense level and criminal history category. I want it to be clear that even if I had accepted any of the objections or arguments that I have rejected, the sentence I have announced today would be the same untethered from the [G]uidelines. That is, based on the [§] 3553(a) sentencing factors, I would impose the same sentence, even if the [GSR] had been reduced by my acceptance of an argument that I have not accepted.

Ahmed timely appealed.

## II.

Ahmed challenges the procedural and substantive reasonableness of his sentence. "Where challenges are to the procedural and substantive reasonableness of a sentence, '[o]ur review process is bifurcated: we first determine whether the sentence imposed is procedurally reasonable and then determine whether it is substantively reasonable.'" United States v. Flores-Quiñones, 985 F.3d 128, 133 (1st Cir. 2021) (quoting United States v. Reyes-Torres, 979 F.3d 1, 6-7 (1st Cir. 2020) (alteration in original) (internal quotation marks omitted)). "In the sentencing context, we evaluate claims of unreasonableness in

- 13 -

light of the totality of the circumstances." Id. (quoting United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013)).

## A.

Ahmed asserts that the district court erred procedurally both in imposing the four-level leader/organizer role enhancement, see U.S.S.G. § 3B1.1(a), and in calculating the loss amount attributable to Ahmed, see id. § 2B1.1. He argues that no role enhancement was warranted and that the court should have (1) excluded the providers' overbilling for noninterpreter services from Ahmed's loss amount and (2) reduced the loss amount to give credit for interpreter services he provided. Ahmed contends that correcting these alleged errors produces a Total Offense Level of 15, which, with his Criminal History Category of I, would result in a GSR of 18 to 24 months, as opposed to the Total Offense Level of 25 and GSR of 57 to 71 months adopted by the district court.[6] See id. ch. 5, pt. A.

"When mulling the procedural reasonableness of a sentence, we afford de novo review to the sentencing court's

---

[6] At one point in his brief, Ahmed also references a loss amount of $558,390.14 -- between his preferred figure of $436,195.00 and the $1,863,264.85 calculated by the district court -- that he says would result if we accepted only one of his two arguments on loss amount. Because we ultimately conclude that any alleged procedural error by the district court was harmless even assuming, favorably to Ahmed, that all of Ahmed's Guidelines arguments are correct on their merits, we need not separately consider this compromise position.

- 14 -

interpretation and application of the [Guidelines], assay the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion." United States v. Ouellette, 985 F.3d 107, 110 (1st Cir. 2021) (quoting United States v. Ruiz-Huertas, 792 F.3d 223, 226 (1st Cir. 2015)).

In this case, however, "we may bypass the substance" of Ahmed's arguments because "any [procedural] error that the [d]istrict [c]ourt may have made . . . was harmless." United States v. Ayala, 991 F.3d 323, 326 (1st Cir. 2021). "[W]e have consistently held that when a sentencing court makes clear that it would have entered the same sentence regardless of the Guidelines, any error in the court's Guidelines calculation is harmless." Ouellette, 985 F.3d at 110; see, e.g., Ayala, 991 F.3d at 326-27; United States v. Graham, 976 F.3d 59, 62-63 (1st Cir. 2020). In Ouellette, for example, we concluded that any error in the district court's Guidelines calculations was harmless because the court had announced during sentencing that the sentence it imposed was "untethered from the [G]uidelines" and that it "would impose precisely the same sentence even if the applicable [GSR] would have been reduced by any or all of the objections made [by the parties]." 985 F.3d at 109-10. The district court in this case used strikingly similar language in stating that Ahmed's sentence was "untethered from the [G]uidelines" and that the court "would impose the same sentence, even if the [GSR] had been reduced by

[its] acceptance of an argument that [it] ha[d] not accepted." As in Ouellette, "[b]ecause the district court made clear that it would have imposed the same sentence regardless of the Guidelines, any alleged error in calculating [Ahmed's GSR] is harmless." Id. at 110.

Ahmed argues that the alleged errors were not harmless because the district court "found that a variance from the low end of the [GSR] was warranted," and so "if . . . the case is remanded to the [district court] for resentencing, the sentence could be lower." But this optimistic view is impossible to square with the district court's unqualified statement that it "would impose the same sentence, even if the [GSR] had been reduced by [its] acceptance of an argument that [it] ha[d] not accepted." For remand to be appropriate, there must be "at least a possibility that the [district] court would have imposed an even more lenient sentence had it started with a lower GSR." Alphas, 785 F.3d at 780 (declining to hold any error harmless where the district court said it was "unlikely," but not impossible, that a lower GSR would result in a lower sentence). The record "does not admit of such a possibility" here. Ayala, 991 F.3d at 327. There was no reversible procedural error.

B.

Ahmed also challenges the substantive reasonableness of his sentence, arguing that if his Guidelines arguments regarding

- 16 -

loss amount and the leader/organizer enhancement are correct, "his sentence was substantively unreasonable," but acknowledging that if we affirm the district court's Guidelines calculations, his substantive unreasonableness claim "is weak at best." Because we decline to address the merits of Ahmed's Guidelines arguments in the context of his procedural reasonableness claim, and because his substantive reasonableness claim turns on those arguments, we assume, favorably to Ahmed, that he can raise those arguments in the substantive reasonableness context. Cf. Ouellette, 985 F.3d at 111 ("[E]ven if we are satisfied that [a procedural] error did not affect the district court's determination of the sentence, we still must review the sentence for substantive reasonableness." (quoting United States v. Tavares, 705 F.3d 4, 27 (1st Cir. 2013))). We determine that there was no Guidelines error and conclude that his sentence is substantively reasonable.

### 1.

Ahmed's first Guidelines claim contests the district court's conclusion regarding loss amount; he argues that the court erred both in holding him responsible for amounts billed by providers for their own services and in declining to credit him for interpreter services he purportedly provided. "We review the [d]istrict [c]ourt's 'interpretation and application of the [Guidelines]' de novo, and factual findings, including the [d]istrict [c]ourt's 'calculation of the amount of loss, for clear

error.'" United States v. Cadden, 965 F.3d 1, 31 (1st Cir. 2020) (citations omitted) (first quoting Flores-Machicote, 706 F.3d at 20; and then quoting United States v. Ihenacho, 716 F.3d 266, 276 (1st Cir. 2013)). "A defendant 'dissatisfied with the sentencing court's quantification of the amount of loss in a particular case must go a long way to demonstrate that the finding is clearly erroneous.'" United States v. Curran, 525 F.3d 74, 79 (1st Cir. 2008) (quoting United States v. Rostoff, 53 F.3d 398, 407 (1st Cir. 1995)). We conclude that Ahmed's arguments are without merit.

a.

Ahmed first challenges the district court's inclusion of the amounts billed by coconspirator providers for clinical services -- rather than interpreter services -- in his loss amount. "Defendants who engage in a 'jointly undertaken criminal activity' are responsible for . . . losses that result from 'reasonably foreseeable acts committed by others in furtherance of the jointly undertaken criminal activity.'" United States v. Delima, 886 F.3d 64, 72 (1st Cir. 2018) (quoting United States v. Pizarro-Berríos, 448 F.3d 1, 8 (1st Cir. 2006)); see U.S.S.G. § 1B1.3(a)(1)(B). A "sentencing court must [(1)] 'ascertain what activity fell within the scope of the specific conduct and objectives embraced by the defendant's agreement,' and [(2)] then 'determine to what extent others' acts and omissions that were in furtherance of jointly undertaken criminal activity likely would have been foreseeable by

- 18 -

a reasonable person in [the] defendant's shoes at the time of his or her agreement.'" Delima, 886 F.3d at 72-73 (quoting United States v. LaCroix, 28 F.3d 223, 227 (1st Cir. 1994)). We review each of these "fact-bound determination[s]" for clear error. United States v. Sandoval, 6 F.4th 63, 106 (1st Cir. 2021); see United States v. Carrozza, 4 F.3d 70, 76 (1st Cir. 1993) ("Such determinations are, of course, all inherently fact-bound.").

Ahmed challenges the district court's compliance with both prongs. With respect to the first inquiry, he asserts both that the district court failed to "make particularized findings concerning . . . the scope of Ahmed's agreement and whether the conduct of the individual counseling providers exceeded the scope of his agreement" and that "the evidence was insufficient to show that Ahmed's agreement in any way encompassed the fraud that was being committed by the counseling providers." With respect to the second prong, he argues that "there was insufficient evidence from which to conclude that it was foreseeable that the providers would overbill for their own services in addition to overbilling for translation services." We find no error in the district court's reasoning.

The transcript of Ahmed's sentencing hearing undercuts his first argument: During the proceeding, the district court made explicit findings about the nature and scope of Ahmed's agreements with the counselors involved. The court found, for example, that

Ahmed "conspired with mental health counselors to fraudulently bill MaineCare for mental health counseling services and accompanying translation services provided to Somali clients"; that he "knew that the records being submitted to MaineCare were not accurate"; and that submission of such fraudulent claims "was, in essence, the whole point of the[] scheme."

And contrary to Ahmed's second argument, the evidence supports the district court's findings. In determining relevant conduct, a sentencing court "may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3 cmt. n.3(B). The sentencing record showed that Ahmed at least implicitly agreed to the providers' overbilling for clinical services. Multiple providers described Ahmed's pressuring them to inflate the number of units for which they billed. The district court noted that Daigle, for example, "explained that she [was] . . . pressured by [Ahmed] . . . to bill for services not provided." Common sense dictates that, to avoid claims' appearing obviously fraudulent, providers would need to overbill for clinical services to correspond to the units billed for interpreter services. Cf. 10-144 Me. Code R. ch. 101, ch. I, § 1.06-2(A) ("Interpreter services can only be covered in conjunction with another covered MaineCare service or medically necessary follow-up visit(s) to the initial covered service."). The district court did not err in concluding

that the providers' overbilling for clinical services fell within the scope of Ahmed's agreement.

The district court did not err in concluding that the providers' overbilling was foreseeable to Ahmed. As the district court recognized, Ahmed "knew or should have known that the providers could only seek reimbursement for interpreter services in the same units of time as they sought reimbursement for the counseling services." A reasonable person in his position would have foreseen that the providers would overbill for clinical services in addition to interpreter services.

b.

Ahmed next objects to the district court's refusal to credit him for interpreter services he purportedly provided in the course of the scheme.

The Guidelines provide that a defendant's loss amount "shall be reduced by . . . the fair market value of . . . the services rendered . . . by the defendant." U.S.S.G. § 2B1.1 cmt. n.3(E)(i). But "in a case . . . where a defendant's claims were demonstrably rife with fraud[,] . . . a sentencing court may use the face value of the claims as a starting point in computing loss." Alphas, 785 F.3d at 784; see United States v. Iwuala, 789 F.3d 1, 14 (1st Cir. 2015) (applying this framework in a Medicare fraud case). "'[T]he burden of production will then shift to the defendant, who must offer evidence to show' why the loss figure

- 21 -

should be set at a lower amount." Iwuala, 789 F.3d at 14 (quoting Alphas, 785 F.3d at 784). "After the record is fully formed, the sentencing court must determine the amount of loss that the government (which retains the burden of proof) is able to establish." Id. (quoting Alphas, 785 F.3d at 784). The district court concluded -- and Ahmed does not dispute on appeal -- that this "case is rife with fraud." The Alphas burden-shifting framework applies, and Ahmed bore the burden of producing evidence justifying a reduction in his loss amount from the initial figure proven by the government.[7] We review the district court's findings regarding loss amount for clear error. See, e.g., Cadden, 965 F.3d at 31.

In the district court, Ahmed sought to meet his evidentiary burden in two ways. First, based on statements by Daigle, Borst, and a counselor at Facing Change, he purported to calculate "rudimentary" ratios representing the degree to which Ahmed's loss amount related to each practice should be reduced. For example, Ahmed argued that, because Daigle indicated in a law enforcement interview that "anything over [five units in a given

---

[7]  We note that, although the Alphas burden-shifting framework allows the government to use "the face value of the claims as a starting point" for the loss calculation, 785 F.3d at 784, the government in this case chose "for efficiency purposes" to instead use "the amount[] actually paid by MaineCare, which is roughly $250,000 less than the amount billed." This choice worked to Ahmed's benefit, and he unsurprisingly does not question it on appeal.

session] was an overbilling" and because Daigle generally billed for ten units per session, Ahmed's loss amount related to Daigle's practice should be reduced by 50%. Second, he submitted records purporting to show that some of the patients involved in the conspiracy received mental health care paid for by MaineCare before and/or after interacting with the conspiracy. We conclude that the district court did not clearly err in finding that neither submission warranted a reduction in Ahmed's loss amount.

We first consider Ahmed's proposed offset ratios. The evidence offered by Ahmed in support of his calculations suffered from a number of obvious defects. With respect to Daigle, Ahmed's proposed ratio relied on a report describing an interview with law enforcement in which Daigle "estimated that anything billed over 5 units was fraudulent." The report does not state that Daigle was certain that the first five units of each session were legitimate -- only that anything beyond that was not -- and characterizes her five-unit figure as an "estimate[]" based on "preliminary calculations."

With respect to Borst, Ahmed's proposed ratio rested on the assertion that "Borst told investigators that the typical session was thirty minutes," or two units. Borst did state in an interview that in "basically every patient session [Ahmed] interpreted for, [he] would get up after about thirty minutes and just leave with the patient." But she did not state that those

thirty minutes were spent on legitimate counseling; on the contrary, she later described many visits as "pretty much just . . . check-in[s]." Moreover, her description of most sessions as lasting thirty minutes was contradicted by other record evidence: Borst testified to the Ludwig grand jury that some visits never actually took place; that she could not tell from her records whether any particular visit occurred; and that typical visits with Somali clients, at least early in the conspiracy, lasted only "10 or 15 minutes." Further, as the district court noted, "[g]overnment surveillance of the Borst practice for 13 days observed that on six of those days Borst saw no patients but submitted claims for 10 to 12-1/2 hours of service," and "[o]n other days agents saw patients come into the office for no longer than 16 minutes, yet Borst submitted claims for every patient for two and a half hours."

Finally, with respect to Facing Change, Ahmed's proposed ratio depended on his assertion that one counselor at the agency, Danielle Defosse-Strout, "told investigators that the typical session with Mr. Ahmed was 2 to 3-units, or 30 minutes to 45 minutes." Defosse-Strout did say in one interview that "most visits involving [Ahmed] were 30-40 minutes in length." But she claimed in a different interview that a "typical visit with [Ahmed]" lasted fifteen minutes, and she stated that -- whatever the length of the visits that Ahmed in fact attended -- most

patient visits for which Ahmed purportedly provided interpreter services, and for which she billed MaineCare, did not actually occur: only one-third of billed visits involved client contact. Further, Defosse-Strout did not state that those visits that did take place involved legitimate services.

The district court also considered during sentencing the evidence that any sessions that did occur did not involve treatment for MaineCare eligible conditions. As the court recounted, Borst, for example, "explained that she didn't provide any counseling services to her Somali patients because her visits with them were so brief and disorganized." Defosse-Strout testified that she had had patients who did not require treatment whom Ahmed would resist discharging, and admitted to falsifying billing codes to obtain reimbursements for services not covered by MaineCare. Another Facing Change counselor, Brittany Harrington, described instances in which Ahmed would bring back former clients whom she did not believe needed treatment and whom she had recently discharged, with Ahmed claiming that the clients were experiencing symptoms they had never before reported.

As the district court also highlighted, testimony at Ludwig's trial by former Facing Change patients for whom Ahmed served as interpreter cast further doubt on the legitimacy of the services offered. One former patient testified that he did not know why he was brought to the agency and that he attempted to

tell staff that he did not need any assistance.  Another explained that he had hoped to receive treatment for asthma and a toothache, rather than for any mental health concerns.

Finally, the district court "note[d] that there was substantial testimony calling into question the legitimacy of the translation services that were provided by [Ahmed]."  Harrington stated both in an interview with law enforcement and in testimony during Ludwig's trial that she doubted the accuracy of Ahmed's work.  She explained that Ahmed used "clinical-based terms" that patients "would not know" or were unlikely to use, such as "flashbacks," and spoke for lengths of time that did not match the patients' speech -- including instances where he answered without the patients' having spoken at all.  Defosse-Strout raised similar concerns that "what [Ahmed] was translating back to her wasn't what the client was actually saying," as his "translated responses . . . were all suspiciously identical."

On this record, it was not clearly erroneous for the district court to conclude that Ahmed's back of the envelope calculations based on a few provider estimates were insufficient evidence to show that a portion of the claims were legitimate. See United States v. Arif, 897 F.3d 1, 11 (1st Cir. 2018); see also, e.g., United States v. Mathew, 916 F.3d 510, 521-22 (5th Cir. 2019) (affirming district court's denial of loss amount credit to defendant despite his submission of "medical documents, patient

interviews, and witness testimony" to show legitimacy of services because "government presented evidence that discredited [his] claims" and evidence); United States v. Bikundi, 926 F.3d 761, 798 (D.C. Cir. 2019) (affirming denial of loss amount credit where defendants "did not produce evidence of [legitimate] services with any specificity").

The other evidence cited by the defense does not undermine this finding. As the district court pointed out, "even taking as true that several of the patients involved during the conspiracy received legitimate mental health diagnoses and counseling before and/or after the fraudulent diagnoses and treatment, that does not mean that . . . the [providers] that [Ahmed] conspired with actually provided treatment for those conditions." This reasoning is not clearly erroneous.

Ahmed's remaining argument is also unpersuasive. He asserts that the district court should have credited him for any legitimate interpreter services he provided "regardless of the legitimacy of the [clinical] service" delivered by providers. In support of this contention, Ahmed cites United States v. Klein, 543 F.3d 206 (5th Cir. 2008), in which the Fifth Circuit concluded that a physician convicted of defrauding insurance companies by billing for appointments that never happened was entitled to a credit against his loss amount for the value of medicine he gave to patients to self-administer. See id. at 208, 213-14. Ahmed

characterizes the medication in Klein as a "connected service" analogous to the interpreter services he purportedly provided. Even assuming that Ahmed provided genuine interpreter services, this analogy does not withstand scrutiny: The government in Klein did not dispute that "the patients needed th[e] drugs and that the insurers would have had to pay for the drugs had Klein merely written prescriptions." Id. at 213. Here, in contrast, interpreter services would be of value to and reimbursable by MaineCare only if "necessary and reasonable" for providing covered services to MaineCare beneficiaries. 10-144 Me. Code R. ch. 101, ch. I, § 1.06-2(A). The district court properly declined to credit Ahmed for interpreter services not associated with legitimate clinical services.[8]

We find no error in the district court's loss calculations.

2.

Ahmed also challenges the district court's imposition of a four-level leader/organizer enhancement. "We review the imposition of this particular sentencing enhancement, and any

---

[8] Ahmed protests that "the logical extreme [of this] reasoning . . . is that a perfectly legitimate, law-abiding ancillary service provider could be denied payment because of the misdeeds . . . of the primary service provider." But because our decision today addresses only sentencing, any ancillary service provider affected is necessarily not "law-abiding." Moreover, our interpretation of the Guidelines does not bear on an interpreter's right to payment by MaineCare or providers.

predicate factual findings, for clear error." United States v. Appolon, 695 F.3d 44, 70 (1st Cir. 2012); see also United States v. May, 343 F.3d 1, 7 (1st Cir. 2003) (noting that "battles over a defendant's status . . . will almost always be won or lost in the district court" (omission in original) (quoting United States v. Conley, 156 F.3d 78, 85 (1st Cir. 1998))). The Guidelines authorize this enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). "Th[e] enhancement requires a district court to make 'both a status determination -- a finding that the defendant acted as an organizer or leader of the criminal activity -- and a scope determination -- a finding that the criminal activity met either the numerosity or the extensiveness benchmarks established by the [G]uideline[s].'" United States v. Hernández, 964 F.3d 95, 101 (1st Cir. 2020) (quoting United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995)). Ahmed concedes that the conspiracy met the Guidelines' numerosity requirement because it involved five or more participants, leaving only the district court's status determination at issue on appeal. Ahmed challenges this determination on various grounds, but none are persuasive.

Ahmed's first argument -- that the district court erred by failing to "specify in its findings the evidentiary basis for its ruling" -- is a nonstarter both legally and factually.

Legally, Ahmed is mistaken in asserting that explicit factual findings are always required: on the contrary, "there is no requirement that the district court specifically find whom the defendant controlled or how he did so." United States v. Payne, 881 F.3d 229, 231 (1st Cir. 2018); see also United States v. Morales-De Jesus, 896 F.3d 122, 125-26 (1st Cir. 2018) ("A district court need not make specific findings justifying its application of a role-in-the-offense-enhancement if 'the record clearly reflects the basis of the court's determination.'" (quoting United States v. Marrero-Ortiz, 160 F.3d 768, 779 (1st Cir. 1998))). In fact, the district court did make relevant findings in imposing the role enhancement. In particular, notwithstanding Ahmed's claim that the court made "no findings about which other participants Ahmed controlled," the court noted that "there certainly [was] evidence that . . . Osman was in some respects subservient to . . . Ahmed," and adopted the PSR's conclusion that Ahmed "appeared to have a leadership role over . . . Osman."

To the extent Ahmed argues that he did not have the requisite authority over at least one of his coconspirators, that argument, too, misses the mark. It is true that, for the enhancement to apply, Ahmed must have led or organized at least one other criminal actor -- and not just a criminal activity -- on at least one occasion. See United States v. García-Sierra, 994 F.3d 17, 37 (1st Cir. 2021); see also United States v. McKinney,

5 F.4th 104, 109 (1st Cir. 2021). But the record supports the district court's conclusion that, at minimum, Ahmed organized or led Osman. Defosse-Strout, for example, stated to investigators that on at least one occasion Ahmed "made [Osman] execute . . . interpreter sheets even though [Ahmed] was the interpreter for the actual visit." Cf. Hernández, 964 F.3d at 102-05 (concluding organizer enhancement warranted where defendant on one occasion gave coconspirator instruction intended to facilitate criminal activity). Both she and Harrington also testified at Ludwig's trial that they understood all of Facing Change's Somali patients, whether brought in by Ahmed or Osman, to be "[Ahmed's] clients." Cf. United States v. Carrero-Hernandez, 643 F.3d 344, 352 (1st Cir. 2011) (noting that defendant's referring to criminal enterprise as "'his' system" supported conclusion that he led or organized coconspirators). Facing Change's billing manager similarly testified that all the firms through which the agency employed Somali translators, including Osman, were "[Ahmed's] operations." Indeed, Ahmed's counsel conceded in the district court that "it did appear that . . . [Ahmed] was a manager or supervisor of . . . Osman." The district court did not clearly err in determining that, at minimum, Ahmed exercised the requisite authority over Osman for the enhancement to apply.

Ahmed next contends that the facts in the record do not support the imposition of the enhancement. He relies on the

factors set forth in an application note to Guidelines section 3B1.1, which provides:

> Factors the court should consider [in assessing a defendant's role in an offense] include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4; see also Appolon, 695 F.3d at 70 ("[T]here need not be proof of each and every factor before a defendant can be termed an organizer or leader." (quoting Tejada-Beltran, 50 F.3d at 111)). Contrary to Ahmed's argument, the district court considered these factors and reasonably concluded that Ahmed qualified as a leader or organizer.

The court's factual findings from the sentencing hearing track the Guidelines factors. The district court found that Ahmed influenced both the providers' schedules and their billing through "his control over the clients" -- which allowed him, and "not the clinicians," to "make the appointments for clients" -- and through "his demands regarding the number of units that had to be billed." These findings reflect Ahmed's "exercise of decision making authority," his significant "degree of participation in planning or organizing the offense," and his "degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4. The

district court also found that Ahmed "was a critically important driving force" in the conspiracy, "was involved from the very beginning . . . until the end," and "was the common denominator as between the three counseling practices that participated in fraudulent billing." Those findings support the conclusion that Ahmed's "participation in the commission of the offense" was substantial, and illustrate the wide-reaching, multi-agency "nature and scope of [his] illegal activity." Id. Further, the district court plausibly found that Ahmed "proposed and influenced Daigle and Borst to participate in the scheme," demonstrating Ahmed's "recruitment of accomplices."[9] Id. Finally, the district court determined that Ahmed "personally received the largest share of the crime proceeds."[10] See id. (listing "the claimed right to a larger share of the fruits of the crime" as a relevant factor in the leader/organizer analysis).

---

[9] In his brief, Ahmed asserts without citation that Daigle recruited Ahmed into the scheme, rather than the other way around. The record does not support this view; Daigle stated to investigators, without contradiction in the record, that the idea to overbill originated with Ahmed.

[10] On appeal, Ahmed concedes that "his gross proceeds over time were larger than the other participants['']," but contends that this was the result of his "working with multiple providers," and that "his percentage share of the proceeds was not higher." Even taking this claim as true, Ahmed does not explain why his greater gross income from the conspiracy would not be a relevant consideration in assessing his role.

The district court also found that Ahmed's "control over the clients" gave him the necessary leverage to influence the providers, who relied on his "ability . . . to provide Somali beneficiaries." The record supports this finding, as multiple providers described Ahmed's role in billing decisions; Defosse-Strout, for example, testified to the Ludwig grand jury that she and Ahmed would negotiate billing amounts and, on occasion, Ahmed would simply "direct[]" her on what claims to file. The district court reasonably concluded that Ahmed's inability to submit claims did not "in any way detract from the initiative and leadership that he displayed in making possible the fraud that the providers then committed." The district court did not clearly err in applying the leader/organizer enhancement.

3.

We turn to Ahmed's substantive challenge and find no abuse of discretion. "We review a preserved challenge to the substantive reasonableness of a sentence under an abuse of discretion standard." Flores-Quiñones, 985 F.3d at 133 (quoting Reyes-Torres, 979 F.3d at 9). "[A] sentence will be deemed substantively reasonable as long as it rests on 'a plausible rationale and . . . represents a defensible result.'" United States v. Ortiz-Pérez, 30 F.4th 107, 113 (1st Cir. 2022) (omission in original) (quoting United States v. Rivera-Morales, 961 F.3d 1, 21 (1st Cir. 2020)). "We rarely find a below-[G]uidelines sentence

- 34 -

to be substantively unreasonable." United States v. Millán-Machuca, 991 F.3d 7, 32 (1st Cir. 2021).

Unsurprisingly, Ahmed's downward variant sentence readily satisfies the substantive reasonableness standard. The district court provided a plausible sentencing rationale. It discussed the § 3553(a) factors, placing particular emphasis on the need to deter future fraud, as Ahmed's activities had "perhaps expose[d] . . . the weaknesses of the MaineCare system," and on Ahmed's personal characteristics and history, including his parental responsibilities. The court's reasoning that a twenty-four-month sentence properly balanced these considerations is plausible.[11]

That result is also defensible: Even under Ahmed's proposed Guidelines calculations (with a GSR of 18 to 24 months), his sentence would fall within the GSR and be "presumptively reasonable." Reyes-Torres, 979 F.3d at 9. Given our rejection of his Guidelines arguments, and the substantially higher applicable GSR of 57 to 71 months, we are still more unlikely to hold the sentence unreasonable. See Millán-Machuca, 991 F.3d at 32. In any event, considering that Ahmed admitted to participating in a

---

[11] We note that the district court's reasoning -- grounded in the § 3553(a) factors and untethered from the Guidelines -- would be equally sustainable even if we had accepted Ahmed's loss amount and role enhancement arguments, which bear only on the Guidelines and do not address the district court's sentencing rationale.

multiyear scheme to defraud MaineCare in which even by his own calculations -- let alone those adopted by the district court -- he personally wrongfully received over $436,000, we cannot say that his twenty-four-month sentence is outside the "universe of reasonable sentences." United States v. Rivera-González, 776 F.3d 45, 52 (1st Cir. 2015). Medicaid fraud like that committed by Ahmed "cause[s] significant harm" by corruptly commandeering funds "meant for the needy." Bikundi, 926 F.3d at 796. After all, every time Ahmed "fraudulently billed [MaineCare], the government lost funds that it otherwise could have used to provide medical care to eligible [Mainers]." United States v. Regueiro, 240 F.3d 1321, 1324 (11th Cir. 2001). The district court did not abuse its discretion by responding to this serious offense with a twenty-four-month sentence.

Ahmed's last argument to the contrary is unpersuasive.[12] He contends that the disparity between his sentence and Osman's renders his sentence substantively unreasonable. It is true that a sentencing court must consider "the need to avoid unwarranted

---

[12] Ahmed's brief also posits that, if his Guidelines arguments carried the day, leaving his sentence at the high end of his preferred GSR of 18 to 24 months, his sentence would be substantively unreasonable because, since "the [district court] held that a downward variance was appropriate . . . , a sentence at the high end of the [GSR] [would not be] substantively reasonable." Because we reject Ahmed's Guidelines arguments, his sentence is below, rather than at the top of, the applicable GSR, mooting this argument.

sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). But because § 3553(a) specifically addresses "unwarranted sentence disparities among defendants with similar records" convicted of "similar conduct," id. (emphasis added), a defendant "must compare apples to apples" by pointing to sentencing disparities between "similarly situated" individuals, United States v. Candelario-Ramos, 45 F.4th 521, 526 (1st Cir. 2022) (first quoting United States v. González-Barbosa, 920 F.3d 125, 131 (1st Cir. 2019); and then quoting United States v. Romero, 906 F.3d 196, 211 (1st Cir. 2018)). Cases involving such apples to apples comparisons "are unusual." United States v. Grullon, 996 F.3d 21, 35-36 (1st Cir. 2021).

Ahmed's argument is easily rejected. He has not in the least shown that Osman was a relevant comparator for these purposes. Ahmed "is attempting to compare apples to kumquats." United States v. Gonzalez, 981 F.3d 11, 23 (1st Cir. 2020). For example, as the district court explained during Ahmed's sentencing hearing, "[t]he conspiracy . . . was begun by . . . Ahmed" "no later than early 2015," with Osman not joining until "sometime in 2016"; Ahmed "personally received the largest share of the crime proceeds"; and "there certainly [was] evidence that . . . Osman was in some respects subservient to . . . Ahmed." Indeed, defense counsel acknowledged to the district court that "it did appear

that [Ahmed] . . . was a manager or supervisor of . . . Osman."
Cf. United States v. Floyd, 740 F.3d 22, 39 (1st Cir. 2014) ("[A]n offender who sits at the top of a criminal hierarchy is not similarly situated to his underlings."). Given Ahmed's and Osman's disparate situations, the difference in their sentences does not establish any abuse of discretion.

III.

We affirm Ahmed's sentence and remand for the limited purpose of addressing the issue identified in footnote 4.